UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:23cr029(MPS) |
| v. | : | |
| SHANE SAWICKI | : | September 13, 2023 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in aid of sentencing and in response to the defendant's sentencing memorandum that was filed on August 28, 2023 (Doc. 67). On February 16, 2023, Mr. Sawicki pleaded guilty to a one-count Information, which charged him with possession with intent to distribute 500 grams or more of methamphetamine, fentanyl, and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 841(b)(1)(C). The defendant was engaged in extremely reckless behavior, selling counterfeit pills containing methamphetamines by the hundreds and thousands. Though the defendant has a minimal criminal history and strong family support, the seriousness of the conduct warrants a significant period of incarceration. For these reasons, the Government respectfully submits that a sentence of 57 months of imprisonment is a reasonable and appropriate sentence in light of all of the sentencing factors.

## I. THE OFFENSE AND RELEVANT CONDUCT

The facts underlying the defendant's conviction are set forth in the U.S. Probation Officer's Presentence Report ("PSR") and do not appear to be in dispute but are summarized herein.

### A. Background

Shane Sawicki first came to the attention of law enforcement as a result of an investigation into a drug overdose that occurred outside his apartment on September 18, 2021. Wethersfield Police responded to the apartment complex, located at 1310 Berlin Turnpike, based on a report of an unresponsive male. The male died on his way to the hospital and, after completing an autopsy, the Office of the Chief Medical Examiner (OCME) deemed the cause of death to be acute intoxication due to the combined effect of fentanyl, xylazine, and ethanol. The deceased male had been located immediately outside the door to the defendant's apartment. Sawicki told police that the deceased had been inside his apartment prior to collapsing in the hallway.

On October 21, 2021, a Source of Information (SOI), called the Wethersfield Police Department to report that he was affiliated with the deceased through Sawicki, who was their mutual drug dealer. The SOI stated that he knew Sawicki to sell blue fentanyl-laced Percocet 30 mg tablets and that he believed that these Percocet tablets are what the victim overdosed on. The SOI also stated that Sawicki stored and sold a variety of controlled substances from his apartment, to include, counterfeit Xanax, counterfeit Adderall, which the SOI indicated contained methamphetamine, "Molly"

2

which is a slang term for MDMA, cocaine, and bottles of codeine. Additionally, the SOI indicated that Sawicki would also have "Farmaprams," a Mexican brand of Xanax, shipped from Mexico. The SOI indicated that Sawicki would conduct sales of these substances from his apartment, as well as in the parking lot of the building and indicated that sometimes Sawicki would allow customers to consume narcotics in the apartment. The SOI also explained that Sawicki would often have mail parcels containing the "Farmaprams" shipped to the Wethersfield Post Office, where he would pick them up.

In February of 2022, a Wethersfield Police officer, working as a Task Force Officer with the Drug Enforcement Administration (DEA) became aware of a drug trafficking investigation being conducted by the FBI out of Springfield, Illinois. The targets of the investigation where engaged in the distribution of crystal methamphetamine and Xanax, and were shipping those substances from the area of Santa Ana, California to customers located in other areas of the country. Since the initiation of the investigation, the FBI had made several seizures of parcels containing crystal methamphetamine and/or Xanax, including "Farmapram" pills, which is a Mexican brand of Xanax. Telephone toll analysis revealed that the target of the Springfield investigation had been in frequent contact with Sawicki.

On or about April 8, 2022, an inspector with the United States Postal Inspection Service identified a package which was addressed to "Shane Sawicki, 1310 Berlin Turnpike Apt 308, Wethersfield, CT 06109" and bearing a return address of "Jose R., 2506 W California St., Santa Ana, CA 92204." A narcotics canine alerted to

3

the package and a search warrant was obtained. Inside the package were two sealed bottles of the "Farmapram" pills. A subsequent review of postal business records revealed that Sawicki was using his cellular telephone to track the location of the seized package 10 times between the dates of April 9 and April 13, 2022. A further inquiry of US Postal records revealed that prior to this package, a total of four other parcels had been mailed to Sawicki's address from the Santa Ana, California area since April 30, 2021.

On April 29, 2022, a search warrant was executed at Sawicki's residence at 1310 Berlin Turnpike, Apartment 308, Wethersfield, CT. The search revealed a large quantity of controlled substances, to include:

- Three (3) zip lock bags with numerous round orange pills marked AD/30
- Two (2) zip lock style bags each containing numerous oval shaped orange pills marked B974 30
- Several plastic bags with blue bar-shaped pills
- Two plastic bags of green bar-shaped pills
- Several plastic bags of white bar-shaped pills
- Two opened bottles of Farmapram pills
- Approximately thirty-eight (38) blue pills marked M 30
- One (1) plastic bag with orange powder
- One (1) small rubber case with orange powdered substance
- One (1) plastic bag with three (3) unknown blue pills
- Approximately forty-six (46) white bar-shaped pills

- Numerous assorted pills of different colors and shapes

- One (1) bottle of "Farmapram" pills

- One (1) small ziplock bag and one (1) plastic bag each containing suspected cocaine

- One (1) small Tupperware container with suspected "molly"(MDMA)

There were also large quantities of suspected marijuana and drug packaging and processing materials.

During the execution of the search warrant, Sawicki indicated that he was willing to speak with investigators. After being read his *Miranda* warnings, Sawicki was asked about the drugs in the apartment. It was pointed out to him that the Adderall appeared to be counterfeit and he acknowledged that they were but represented that the pills had the same physiological effect as pharmaceutically made Adderall. Sawicki claimed that he bought the "Adderall" pills for an upcoming spring break trip and was only holding them for a group of friends. In reference to the blue "M30" pills he claimed he was holding them for a friend that was addicted to opioids and was keeping them to prevent his friend from using them.

Selected items of evidence were submitted to the DEA Northeast Regional Laboratory for chemical analysis. The results that were received indicated that:
- The three (3) ziplock bags with numerous round orange pills marked AD 30, contained approximately 2,712 pills which weighed approximately 900 grams and tested positive for methamphetamine;

- The (2) ziplock style bags each containing numerous oval shaped orange pills marked B974 30, was found to weigh approximately 49 grams and tested positive for methamphetamine;
- The thirty-eight (38) blue pills marked M30, weighed approximately 4.8 grams and tested positive for fentanyl;
- The one (1) small ziplock bag and one (1) plastic bag each containing suspected cocaine, was found to weigh approximately 5.55 grams and did test positive for cocaine.

On July 7, 2022, Sawicki was arrested on a criminal complaint and agreed to be interviewed by investigators. Sawicki discussed how he had been purchasing "Adderall" and "M30" pills from a group of individuals outside CT for approximately two years. He discussed the price that he paid per pill, the quantities he would purchase and the frequency with which he made purchases. He noted that he would typically purchase five thousand (5,000) "Adderall" pills at a time but would buy less "M30" pills, with the most being up to fifteen hundred (1,500) pills at a time. Sawicki would make these purchases at least once a month but often more frequently. Sawicki went on to discuss the prices that he charged to sell the "Adderall" and "M30" pills to his customers.

On that same date, Sawicki signed a written consent form authorizing the search of his apartment. The search revealed:

- Approximately three hundred seventy-one (371) round orange pills imprinted AD/30 (suspected counterfeit Adderall)
- One (1) ziplock bag containing approximately one hundred twenty-four (124) white rectangle pills imprinted G3722 (suspected Xanax)
- Various sized, colored, and shaped pills
- Approximately forty-three (43) round orange pills imprinted AD/30 (suspected counterfeit Adderall)

Additionally, Sawicki consented to the search of his cellphone, which was seized and subsequently searched by investigators. The resulting search uncovered additional evidence regarding Sawicki's possession and sale of controlled substances. This evidence included, but was not limited to, photographs of marijuana, butane hash oil, cocaine, Xanax, Farmapram, Oxycodone, and large amounts of various other types of pills, including blue "M30" pills and orange "Adderall" pills, consistent with the counterfeit Oxycodone and counterfeit Adderall found in Sawicki's apartment. There were also photographs of large amounts of U.S. currency and numerous text message conversations regarding the sale of illicit substances.

For Example, from May 20, 2021 to June 2, 2021, Sawicki had a series of text communications with someone named "Kev," who was frequently purchasing drugs from Sawicki. In one instance, "Kev" asked how "much for the M's and 140 A's." Sawicki responded, "550$ for ms and I need 28$ a pop cuz I did the K9's for 26 and it's spose to be 28 and I paid little more for these" "so 100 for 2800$." "Kev" tried to bargain for a better price and Sawicki responded:

"I can't man I did u a deal last time when it wasn't even a full hundo pack. I gotta stay firm at 28"

"If you grab 140 it's 3900 even"

"plus the 550"

"how many are you trying to grab?"

"Of the A's"

"How's this. If u grab 140 A's with the 55 m's I'll do 4K$ even"

It should be noted that "M's" is a common reference for M30 oxycodone pills and "As" or "Addys" is a common reference for Adderall pills. "K-9's" is a common term to describe Oxcodone Hydrocloride pills, which are stamped "K/9."

On the same date, it appears, based on a video Sawicki sent to "Kev" and the surrounding texts, that "Kev" was unsatisfied with pills purchased from Sawicki and came to his apartment to recoup his money, but while there "Kev" and an associate stole cash and marijuana from Sawicki. Sawicki then sent text communications to "Kev" complaining about the theft and trying to explain:

> "I was upfront about everything. If they weren't real I didn't know that and I was working it out telling u I got ur money and u already stole it back and was convincing me I didn't even have it and took my bud as collateral? That's fucked up. U stole more then what u payed and u got them all still and my bud. That's like over 5k$."

"Kev" responded by sending a picture of a rapid drug test showing a positive result for fentanyl. Along with the message, "positive for fentanyl bro your fuckin grimey I should've pistol whipped you and took all your shit!!!"

In another series of texts from May 9, 2021 to February 4, 2022, Sawicki engaged in frequent discussion of drug sales with "J Pop." On August 2, 2021, the following exchange took place:

> "J Pop": "So 23 m and then presses man . . .?"
>
> Sawicki: "Their newer ones. Their fire from what everyone who's tried them has said. I thought I had more Ms left I had less than I thought. If you don't like them I'll get u with diff when I can and just save those or I'll hook u up with addy or beans"

"J Pop" said that he would try one and let him know and, shortly thereafter texted:

> "J Pop": "Are they fet tested? I think I'm legit allergic to that shit so I'm not tryna die"
> "Yeah I'm not really with them man they even taste off. You gave me 23 ms so 23 x 25 = 575, so could you send me back like 425 and I'll give u all these back next time I grab?"
>
> Sawicki: "I'll take em back. Do u want like addy or I can wait until I can get more Ms or any scripts and swap them."
>
> "J Pop": "W.e is easier for u homie…. Appreciate it cuz yeah I ain't gunn take em" "made me feel off tbh."

On November 15, 2021, "J Pop" asked, "How many prcs could I get for 8?" Sawicki responded, "Like I said I have only hundo packs for sale and their 1500$ each." In another conversation, "J Pop" wanted to purchase "Addys," Farmapram, and percocets and Sawicki quoted him a price of $1,300.

In another example, on April 28, 2022, Sawicki had a text message conversation with a person listed in his contacts as "Luke." In this series of commuications, "Luke" wrote:

9

"Are the ones I thumbs up the ones your [sic] talking about,"

"N what's the number on them,"

"I like grabbing a mix feel me,"

"Some people want the crazy fetty ones," and

"N those look beautiful."

In response Sawicki stated:

"Those are all ones I've grabbed from the past,"

"I can get the M's for a good price,"

"I thumbsed up them,"

"Those are the M's in most of the pics. I've grabbed prob 50k of them since last year,"

"Very consistent press," and "No fent only oxy."

As noted above, "M's" is a common reference to M30 oxycodone pills. In this conversation Sawicki acknowledged that the pills were counterfeit when he said, "very consistent press," which references the fact that the pills are being pressed. Additionally, as noted above, during the search of Sawicki's apartment on April 29, 2022, investigators seized a quantity of blue pills stamped "M30", which came back positive for fentanyl.

In another text communication on April 28, 2022, Sawicki had a conversation with a person listed in his contacts as "Cam." In part, Sawicki wrote:

"Ur boy gona want those addys? Cuz I can do 1300$ for 500 vs 1500$,"

"If u wanted to grab early and make 200$ is basically what I'm saying lol."

During this text conversation Sawicki makes reference to charging thirteen hundred dollars for five hundred "Adderall" pills. As described above, during the search of Sawicki's apartment, investigators seized a large quantity of counterfeit Adderall pills (AD30), which tested positive for methamphetamine.

## II. STATUTORY EXPOSURE AND GUIDELINES RANGE

### A. Statutory Exposure

Based on the defendant's plea of guilty to Count One of the Information, for a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 841(b)(1)(C) he faces a mandatory minimum period of incarceration of 10 years with a maximum of life, a fine of up to $10,000,000, a period of supervised release of at least 5 years with a maximum of life, and $100 special assessment.

### B. Guidelines Calculation

The parties agree, and the PSR concurs, that the defendant's base offense level is 30, based on the calculated drug quantity. See PSR ¶ 30. With three levels subtracted for acceptance of responsibility, the total offense level is 27. *See* PSR ¶48.

The parties likewise agree that based on the current sentencing guidelines the defendant falls in Criminal History Category II, based upon one prior conviction, and two additional points due to his having committed the charged offense while under a criminal justice sentence. See U.S.S.G. §4A1.1(d). Absent the 10-year mandatory minimum sentence which applies to the instant offense, a total offense level 27 with

a criminal history category II results in a Guidelines range of 78 to 97 months imprisonment.

In the plea agreement the parties agreed that under 18 U.S.C. §3553(f)(1)–(5) the defendant qualified for the "safety valve" exception, which would allow the Court to depart below the mandatory minimum penalties, as well as result in a two-level reduction of the total offense level. The PSR correctly notes that while the defendant is eligible for said reduction under 18 U.S.C. § 3553(f)(1)–(5), he does not meet the requirements under U.S.S.G. § 5C1.2. *See* PSR ¶ 3. The PSR also notes that the defendant's eligibility under the statute could serve as a basis for a variance and the Government supports the Court applying this variance. *Id*.

If the Court were to allow for such a variance, a total offense level of 25 with Criminal History Category II would result in a Guidelines range of 63 to 78 months imprisonment.

Additionally, it is anticipated that on November 1, 2023, amendments to the U.S. Sentencing Guidelines will go into effect and that application of the amendments may be applied retroactively. One of the amendments, as noted in the PSR, relates to U.S.S.G. §4A1.1(d), which will change the circumstances under which criminal history points are added for individuals who commit offenses while under a criminal justice sentence. See PSR ¶128. If the proposed amendment were presently in place, the defendant would not have the two additional points which were applied in this case and his criminal history category would be reduced. The Government recognizes the Court's authority to grant such a variance on this basis and would ask the Court

to do so. If the Court were to make such a finding, a total offense level of 25 with Criminal History Category I would result in a Guidelines range of 57 to 71 months.

## III. LEGAL STANDARD

After the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005) rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir.), cert. denied, 127 S. Ct. 192 (2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. See 18 U.S.C. § 3553(a).

## IV. DISCUSSION

Taking into account all of the statutory considerations, and the specific features of Mr. Sawicki's individual case, the Government respectfully requests that the Court sentence the defendant to a sentence of 57 months of imprisonment.

### A. Nature and Circumstances of the Offense

First, a sentence of this length reflects the serious nature of the conduct at issue and the extreme danger that existed when the defendant chose to sell all manner of counterfeit pills. The defendant was selling many different types of drugs, which included some less dangerous drugs, such as marijuana. However, he was primarily engaged in the distribution of pills. Pills, which were not coming from a pharmaceutical company, where there was some measure of oversight and quality control, but rather, were illicit pills that were being pressed and sold on the black market. The defendant had no direct knowledge of what substances were being used to create these pills. They were pressed to look like Adderall or Oxycodone, but they contained other, more dangerous, substances. The counterfeit M30 pills recovered from his apartment contained fentanyl, a substance that is killing thousands of people across the country every year. The counterfeit Adderall contained methamphetamine, which is an extremely dangerous drug in its own right.

The PSR notes that the investigation did not reveal evidence that the defendant knowingly marketing or misrepresented the fentanyl pills as another substance. *See* PSR ¶35. This is true. There was no evidence gathered that the defendant definitively knew that a substance that he sold contained fentanyl prior to

14

selling it. Yet, his text communications make clear that on multiple occasions, at least after the fact, he learned that pills he sold contained fentanyl. This did not stop him from continuing to engage in the distribution of illicit pills. He knew that what he was selling could contain substances other than that which they were pressed to look like, he knew the fake M30's might contain fentanyl, and he sold them anyway.

The defendant should also have known better than most how extremely dangerous his conduct was. Mr. Sawicki saw up close the tragedy of drug abuse, and the danger of fentanyl, when he witnessed his friend die of a drug overdose outside his apartment door. The Wethersfield Police investigation that followed that death did not establish that the drugs came from Mr. Sawicki or that they were necessarily consumed in his presence. Still, even if he played no role in that particular death, that experience should have been a wake-up call. It should have been an experience that truly crystalized in his mind the possible outcome every single time he sold a pill that might contain fentanyl or some other substance. If that death had any effect on the defendant, it was not enough to get him to stop. When the DEA showed up at his apartment more than seven months later, he was in possession of a cornucopia of illegal drugs, primarily counterfeit pills. This conduct merits a significant punishment.

### B. History and Characteristics of the Defendant

In looking at the defendant's history and characteristics, there are, in the Government's view, both mitigating and aggravating factors. First, the defendant is deserving of some credit for his cooperation with law enforcement and his acceptance of responsibility. When law enforcement

first executed a search warrant at his residence, the defendant lied to agents. He made up claims about holding drugs for a friend and possessing other drugs for a spring break trip, when in truth he was engaged in the distribution of narcotics. However, after he was arrested, the defendant was cooperative and spoke freely with agents about his drug dealing. The defendant consented to a search of his apartment and a search of his cellular telephone, which he did not have to do, though search warrants would likely have been obtained in any case. Mr. Sawicki also chose to accept responsibility for his conduct and agreed to plead guilty to an Information rather than require the Government to pursue an Indictment.

Likewise, it bears noting that the defendant has a limited criminal history, with only one prior conviction. His one prior conviction was for a misdemeanor offense, where he did not receive any jail time, but shows a concerning lack of self-control. Though this was his only conviction, it was not his only police contact. As the PSR makes clear, Mr. Sawicki has had at least three other arrests where he has had the benefit of diversionary programs or had charges nolled. In one of those cases, which was close to 7 years before the instant conduct, the defendant was involved in cultivating marijuana in his garage.

The defense notes that the defendant has a long history of substance abuse. The incidents cited in the PSR surrounding his operating of motor vehicles while under the influence of a variety of drugs seems to highlight that fact. *See* PSR¶ 76 & 77. The Government does not dispute that the defendant has had a drug problem, but it does disagree that this in any way mitigates his conduct. The text communications taken from the defendant's phone do not depict a person that is desperate for his next "fix" or begging people for money or asking anyone "to front" him drugs, as is often the case with the severely addicted. Instead, the text messages make clear that the defendant was a significant dealer. He was the one being solicited by others "in need" of pills.

He was one selling large quantities of drugs for significant amounts of money. He was not just selling to support his own habit. At some point many years ago, it might have started that way, but by the time of his arrest in this case, he was engaged in the distribution of very significant quantities.

The defendant spends a considerable amount of time in his sentencing memorandum discussing the loss of his mother at a young age. His mother's death clearly had a great impact on his teenage years and may well have altered what would otherwise have been the normal trajectory of his life. That being said, he is now 29 years old and is 15 years removed from that event. Understanding that this loss will always be with him, it is difficult for the Government to see how his present criminal conduct can be explained away by that personal loss.

### C. Deterrence, Protection of the Public, Promote Respect for the Law

A significant term of imprisonment also serves the goals of sentencing, including promoting respect for the law, providing general and specific deterrence, and protecting the community from Mr. Sawicki's choices. To date, the defendant has had multiple prior arrests without any consequence. He has had cases dismissed and nolled, and when he did receive a conviction, it did not result in any real penalty. It is not surprising that those prior experiences with the court system had no deterrent effect on his behavior. In fact, the instant conduct was occurring while he had charges pending due to the road rage incident and continued in the same manner after he pleaded guilty and was under a conditional discharge. In that regard, a significant sentence will serve as a real and tangible deterrent to Mr. Sawicki engaging in future criminal conduct.

The Government also has concerns about the defendant's willingness and ability to truly reform his conduct. During the pendency of this case, where the defendant has been facing a 10-year mandatory minimum period of incarceration, he still has been unwilling to follow all of the conditions of release. On multiple occasions the U.S. Probation Office filed notices of non-compliance with the Court. On multiple occasions the defendant failed to show as directed for scheduled drug screens. He tested positive for marijuana and when confronted, he lied and made excuses. In one case, he claimed he was in a car with a friend that was using marijuana. When he tested positive for methamphetamine and marijuana, he denied using and claimed that he was outside folding pizza boxes when he saw some people using marijuana nearby. In March, when he twice tested positive for marijuana, he admitted that he had "moment of weakness." On April 12, 2023, a hearing was held to address this most recent violation, and while there was no sanction imposed, he was warned that he could not continue to use marijuana or there would be a consequence. This still did not stop him from again using marijuana, as he tested positive again. When confronted on this most recent positive test, he denied using marijuana and claimed that he was at a concert where marijuana was prevalent and was being used in his proximity. The defendant's denials strike of an immaturity and point to a belief that he can continue to get out of trouble by lying and making excuses, rather than making real change.

V. **CONCLUSION**

For the reasons stated herein and on the full record of this case and an assessment of the factors outlined in Title 18, United States Code, Section 3553(a), the Government respectfully submits that the sentence which is sufficient but not greater than necessary to accomplish those various sentencing goals is a term of imprisonment of 57 months.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

/s/ *Reed Durham*
REED DURHAM
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct29959
450 Main Street, Room 328
Hartford, CT 06103
(860) 760-6979
(860) 760-7979
reed.durham@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2023, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Reed Durham*

REED DURHAM
ASSISTANT UNITED STATES ATTORNEY